Good morning and welcome to the 5th Circuit. This is day two of this panel, I'm very honored to. Well, we have the state covered. Often when we have panels, we might end up with two Texans, a Mississippian, every now and then a Mississippian, a Louisiana, a Texan. But for this sitting at LSU, we've got all Louisianans. No significance to anything, it just happened to roll out that way. So we have five panels sitting this week, four sitting in New Orleans, and we're honored to be here at the Law Center to hear two days of cases. These are, as you know, regular cases from our dockets, and so we appreciate the lawyers accommodating the arguments being here. I hope the students will benefit as well from hearing the arguments. We have four cases today to be argued in. More probably than not, we'll either run through or we might take a break between the third and the fourth one, but we'll see how it goes. First case is 23-60234, Sierra Club versus the Louisiana Department of Environmental Quality. Mr. Smith. Thank you, Your Honor. Good morning. May it please the court, my name is Joshua Smith on behalf of Sierra Club. In this case, Louisiana issued two Clean Air Act permits to Commonwealth, authorizing the facility to construct and operate a liquefied natural gas processing and export facility, an LNG terminal that will, every day for the next 20 to 50 years, emit thousands of pounds of corrosive nitrogen oxides, particulate matter, and toxic pollution in an area of southwest Louisiana that already faces a higher particulate matter and air toxic risk than 70 to 90 percent of the country, and in an area where the record demonstrates significant violations of the national ambient air quality standards for nitrogen dioxide, meaning the air quality will be unsafe to breathe. The issuance of the permits violates the law for three reasons. First, Louisiana exempted Commonwealth from the requirements of the Clean Air Act, including the requirement to mitigate its demonstrated contribution to air pollution in excess of the NAAQS. Second, DEQ failed to follow the required steps in issuing and making a best available control technology determination for the facility. And third, DEQ failed to fulfill its duty in issuing any Clean Air Act permit to fully evaluate and mitigate to the maximum extent possible the adverse environmental impacts of the facility. Turning back to the first point, DEQ exempted the facility, Commonwealth, from key requirements of the Clean Air Act, and in particular, at the first step of the analysis, relying on what are called significant impact levels, the agency exempted Commonwealth from demonstrating that it will not contribute to excess pollution for a handful of pollutants, particulate matter, sulfur dioxide, and carbon monoxide. Instead, based on modeling, showing that Commonwealth's impacts in a vacuum would be below these so-called significant impact levels. Mr. Smith, help me understand. In your argument, given your view of the Clean Air Act, do you view that there's ever any role for SILs in the analysis? There may be a role for SILs in the analysis if it's done properly, and what we see in this analysis at the second step of the analysis that the agency conducted, there were, in fact, pollutants that are below the SILs where there is evidence that air quality is not going to be affected, and in those situations, it might be okay to use them. But at this first step of the analysis, based on Commonwealth's emissions in a vacuum, the agency determined that no further demonstration was required. So, okay, I'm thinking back to the charts and the briefs where it shows, I forget whose brief this is, but it shows that the SILs, most of the initial, I don't know if modeling is the right word, were below the SILs, but there were a few bolded numbers where it was above, and so further modeling had to be done. Right. In your view, where the numbers were not bolded, is that proper, or are you saying that's improper? That's improper. Okay, why is it improper? That's one of the key problems at the outset. The Clean Air Act itself and Louisiana's regulations require this analysis, the pre-construction analysis, to include an evaluation of ambient air quality, quote, in the area. And that makes sense because the Clean Air Act is concerned not just with but-for causation, but also with contribution to air pollution that could be in excess of the NACs. And without information about air quality in the area, it's impossible to tell whether a particular source is contributing to unhealthy air quality. Well, the word contributing is a little open-ended, isn't it? Hard to say exactly what it means, cause or contribute. In your view, what does it mean? Well, this court often looks to the ordinary definition of the word. Contribute has a plain meaning, and it is any part of or having a share in pollution that is in excess of the national ambient air quality standards. And here the problem at step one is that there was no evaluation and there's no information in the record about air quality in the area. So standing alone, the facility's impacts below that significant impact level don't really tell us anything about overall air quality in the area. And this problem was addressed or recognized by the D.C. Circuit in the 2013 Sierra Club case, where it recognized that improper use of the sills in this way could result in a situation where the permitting agency authorized unlimited facilities that while they each might have an impact below that sill, they could collectively push an area over the limit and into unhealthy air quality. So are you arguing that the EPA's interpretation of the word contribute, which allows, if I'm not mistaken, allows for the use of sills is unreasonable in this case? Well, EPA's interpretation is at best inconsistent, and it is contrary to the Clean Air Act, because the Clean Air Act does require an evaluation of air quality, again, in the area. That can be done through monitoring or it could be done through modeling. But here there's an empty – there's a gap in the record on this point. We don't know what air quality looks like in the immediate vicinity for these pollutants at the threshold. Again, particulate matter, sulfur dioxide, and carbon monoxide. I don't mean to get ahead of you, because I know you're going to talk about your public trustee argument, but if we agree, since we're talking about sills and the use of them right now, if we hold that the sills are valid under the Clean Air Act and that the LDEQ use them appropriately, how does that impact your argument regarding the public trustee duty? Does that undercut that claim or eliminate that claim, or is there some other footing that you can put that on? There is another footing, Your Honor, and the public trustee obligation requires the agency to fully evaluate and disclose the environmental impacts, potential environmental impacts of a permitting decision. And here, in addition to the agency's own evidence showing exceedances of the NAAQS, there is additional evidence showing that if you expand the modeling out to EPA's guidelines, that the exceedances will be approximately eight times the NAAQS. DEQ doesn't offer any explanation as to why that doesn't constitute a significant environmental impact. And moreover, even accepting the agency's use of the sill, there is evidence, again, the agency's own evidence that at times the facility will exceed the sill itself and contribute approximately 37 micrograms per cubic meter of harmful nitrogen dioxide to the area. The agency never grapples with the fundamental disconnect. If they're going to use the sill as a significant level for the Clean Air Act purposes, why is 37.7 micrograms per cubic meter not significant? But I do want to come back to the Clean Air Act analysis for a couple of reasons, because the error that the agency makes at step one is not just an academic one. It has real-life implications, and we see that at step two, where, again, the agency exempted Commonwealth from the obligation to mitigate any pollution in excess of the NAAQS. And at step two of the analysis, again, the agency's own record demonstrates that there will be significant violations of the NAAQS in the area surrounding Commonwealth. As a result, Commonwealth will necessarily be contributing to air pollution in excess of the NAAQS. Now, the Clean Air Act requires DEQ to either deny the permit or evaluate and impose additional mitigation under 40 CFR 51-165-B3. The agency failed to do that and instead decided that that amount of pollution was insignificant. It's worth pointing out at this point, however, that the impacts of the facility are almost certainly understated because of the agency's use of what are average emission factors. And this gets perhaps a little into the weeds, but the Clean Air Act, as part of this analysis, requires the evaluation of maximum potential emissions from the facility. And we see a significant difference between the maximum potential impacts of the facility and the average potential impacts. And you can look at the record here, starting at AR 2167, where the facility itself calculated what maximum impacts would be. And they are, in some instances, for some of the largest sources within the facility, about three times what the modeling evaluated. And so moving on to the second and third point before we run out of time, the mitigation inquiry is not just a formality, and this is where the agency's failure to follow its best available control technology regulations really comes into focus. This is not, and let's be clear, this is not simply a dispute over a technical determination at the end of the day. The agency's analysis of the BACT, Best Available Control Technology Options, is really more akin to the situation the Supreme Court faced in Alaska Department of Environmental Quality and this court faced in the Southwestern Electric Power Company case, where the agency either failed to follow its own regulations or failed to reconcile its factual findings with the conclusions it reached. And in particular, for the combustion turbines at the facility, these are the turbines that will operate the refrigeration and liquefaction trains, is what they're called, and operate the facility more generally. The agency and Commonwealth recognize that there are better emission limits available. And they recognize, and you can go to AR 2-276 and AR 71, page 83, to see this. So it's undisputed that there is a better emission limit available under the BACT regulations in the Clean Air Act itself. The agency was required to choose that best emission limit as BACT unless it could clearly demonstrate, based on a technical record, that that was either infeasible or that cost and other environmental factors made that an unacceptable outcome. The problem here is that there is no discussion of what technical infeasibility might present itself for the combustion turbines. And in fact, it cuts the other way. The record demonstrates that there are multiple other facilities, approximately a dozen other facilities, that achieve a lower emission rate using the same or similar processes for the combustion turbine. And expert evidence in the record also demonstrates that there's no reason that this particular make and model of combustion turbine can't achieve the lower emission rate. Just to have it clear in my mind, in your view, LDEQ chose what, but they should have chosen what else that is BACT? LDEQ chose an emission limit for the nine combustion turbines at the facility, what is 2.5 parts per million. There is evidence that a lower emission rate, closer to 2.0, can be achieved and can be achieved in a technical and cost-effective way. The problem here is that, again, DEQ failed to come back and do any kind of, demonstrate that it was either technically infeasible or that costs outweighed the benefits. With respect to a different kind of control technology for what's called the oxidization system at the facility, and this is really just a fancy word for the burner, the incinerator for waste and toxic gas, there's another technology that is available, as the record demonstrates, that the agency failed to evaluate. Let me ask, in light of your comment about, particularly with regard to the EPA's interpretation of the word contribute, I believe, if I heard you correctly, that you said the EPA has been inconsistent in its application. If the LDEQ has explicitly followed EPA guidance, does your argument require us to find, in this case, in order to grant relief, any or all relief that you seek, that the EPA guidance is arbitrary and contrary to law or is your argument something that prevails even if we don't make such a finding? Two responses, Your Honor. First, at the step one phase, EPA's guidance is contrary to law, in that the guidance allows the agency to avoid any analysis of air quality in the area. It is inconsistent as well, because the legal memorandum that's also in the record at 91 page 6 takes a different view of that step one analysis than the guidance itself. So we have conflicting guidance from EPA itself. And even if EPA was entitled to some deference on this issue, DEQ improperly applied the guidance here at the step two phase,  yet failed to evaluate mitigation on a case-by-case and particularized basis, which is what the guidance requires at AR 75 page 19. And I see that my time is just about up here. If you have any additional questions, I'll be happy. Well, you've reserved your rebuttal time, so we'll see you back up. All right. Here, Ms. Petronio. May it please the Court, Beth Petronio on behalf of Commonwealth LNG LLC. We are here today encouraging the Court to affirm LDEQ's issuance of this permit. We believe that they provided an adequate and appropriate analysis of the scientific and technical factors that relate to this, and they're entitled to a significant amount of deference for the vast majority of the issues that are addressed in the briefing. I'm going to start with the significant impact levels and back up a little bit in terms of how significant impact levels actually developed. And they've been around since the late 70s. This entire program, the Prevention of Significant Deterioration, or PSD permits, has the concept of significance in its title. Section 42 U.S.C. 1740 and Section 42 U.S.C. 7471 discuss prevention of significant deterioration through the use of the state's SIPs. And that's, in fact, what has occurred here. 42 U.S.C. 7476 is Congress instructing the EPA to promulgate regulations containing air quality increments, emission density requirements, and other measures. And what has been long recognized at the EPA and used are SILs as a tool, an air quality tool. Now, remember, we're modeling here. These are not actual existing toxins or particulate matter or emissions in the air. We're modeling those for a source that does not exist. And to do that, there has to be some air modeling requirements. And in this case, they followed the EPA's guidance and went through a three-step process. And they did, in fact, contrary to Sierra Club's assertions, take into consideration the pollutants in the area. And they did that in the second phase of the analysis. So the way in which the air modeling works, they start with what's called a preliminary impact analysis or a significance analysis. We're back to the term significance, determining whether there's a significant impact. That very first analysis is what I would call going to the spigot, the very place where the emissions would be coming out and taking the maximum reading before it's even dispersed into the air. So the absolute maximum. And that's used as a tool to determine whether or not you should do further modeling. And in this case, there were four pollutants that at the spigot, including the nitrogen dioxide that is a significant part of the briefing, that said, yes, do further modeling. Because there's a possibility at the spigot that this is going to create an exceedance of NOx. So from there, what you do is you analyze those four pollutants, and you do a full impact analysis or a cumulative impact analysis, as it's called. And there, you do your air modeling as though the emissions have dispersed in the area. And you include all of the other background sources, everything else that's there, all major sources within the area and 20 kilometers beyond. And then you look at, okay, what did that show us? And in that instance, once you've dispersed, it showed nitrogen dioxide, again, had a possibility of contributing to an exceedance of NOx. So what do you do then? Then you do your third step, which is your source contribution analysis. That is the ultimate determination of whether or not this particular facility is going to contribute to an exceedance of NOx. And once they did that, so the 37 number that you're hearing from Sierra Club that's throughout their briefing, and it's going to be a quarter of NOx and those things, those are all the preliminary at the spigot analysis. But once you get through the full impact analysis to the source contribution analysis, which is what the statute requires you to look at, this project's contribution, it's well below NOx. And they did this at every one of the receptors. So there are, if you look in the record at AR90 Appendix H, it's a long chart of all the receptors they looked at and comparing those contributions to the actual SILs level. And the SILs level for nitrogen dioxide is 7.5. The highest of all of the various receptors is the .7 that you see in the briefing. Many of them were much, much lower than that, .3s, .6s, .03s, .06s, things like that. So what you have here is a situation where they did do exactly the analysis. They took into account the fact that there were other background sources that contributed to the air quality in this area. But once they got to the final determination, there's not an exceedance of NOx here. And so they did a proper analysis. The issue of the statutory construction in terms of the term contribute, other cases that have looked at that have recognized contribute can mean a lot of different things. It's a broad term. And as I said, this statutory scheme recognizes the concept of significance and the contribution and cause to exceedances needing to be significant for purposes of reviewing this type of permit. Counsel, can I ask you a question? I'm not sure this is a fair question, but I'll ask it anyway. Suppose the Supreme Court overturned Chevron. Does your argument change? I don't think the argument changes because I think here, even if there's no deference to the ambiguity of the term contribute, this has been a very persuasive, longstanding, well-thought-out interpretation. So I think it would be entitled to skid more deference. The concept that they've changed their viewpoint over time, I simply disagree with that, Your Honor. The fact that in the 2010 rulemaking there was a reference to don't misuse the SILs does not mean that they have changed their position on SILs. SILs have been the position of the EPA consistently since the late 70s, certainly since they enacted CFR 40 CFR 51-165, which is the specific regulation that says cause or contribute shall mean significantly above the SILs. So certainly since 1986 when that was enacted, they have had this longstanding interpretation that it's a significance level issue. And in that circumstance, I think it's entitled to deference. I don't think there's been any change over time. I don't think that the— I mean, obviously I don't know what the Supreme Court's going to do. I'm just trying to plan for it. I know there's a lot of speculation about what the Supreme Court's going to do in that regard, but I don't think you have to have Chevron deference in this particular case in order to say that the interpretation EPA and subsequently LDEQ, you know, operating on top of EPA, has given to this particular issue. Thank you. What do you say to counsel opposite's argument about inconsistency of the EPA in terms of the guidance? I don't think it's been inconsistent, Your Honor. I think that the fact that in 2010 there was a rulemaking statement that essentially said don't misuse SILs doesn't suggest that they didn't intend for SILs to be the standard. They certainly still did. And, you know, they were attempting, in fact, to codify SILs. And, you know, there was a D.C. Circuit case that they ended up vacating that rulemaking. But since the late 70s, SILs have been the EPA's guidance, and that has not changed at any point. I'd like to just briefly touch on the BACT issues. And I think that in terms of BACT, both of the issues that are addressed in the BACT analysis here that are raised in the briefing are things that LDEQ significantly considered. They applied their technical and scientific expertise, and they concluded that what Commonwealth is using was, in fact, BACT. If you look at the combustion turbine issue, the question there is should they be having 2.0 parts per million or 2.5, which is what Commonwealth suggested and LDEQ approved. And the difference there is really with the selective catalytic reduction technology and LDEQ's knowledge of that technology in the industry. The difference between 2.0 and 2.5 is whether or not that selective catalytic reduction technology can operate consistently at a 90 to 92 percent level. And Sierra Club has suggested that it's possible for it to operate at that high of an efficiency level when, in fact, LDEQ and the industry standards suggest that they operate at more of a 70 to 90 percent efficiency level. So if you apply that, that's how you get to a 2.5 parts per million as opposed to a 2.0. If you set it at 2.0, there's not any certainty that Commonwealth would be able to achieve compliance with that on a regular basis because 90 to 92 percent is just not what's achieved for that type of technology in the industry, and that's something that LDEQ is very well aware of. Same thing if you look at the analysis for the catalytic oxidizers. Very complicated analysis here, but catalytic oxidizers would have required a scrubber to remove trace constituents. They would have required a system to manage waste for that scrubber system, a gas-fired heater that then would raise the temperatures in order to deal with the waste streams. So there's a complicated analysis. It's not something that LDEQ just ignored. They actually said, okay, can we use a catalytic oxidizer instead of a thermal oxidizer, and if so, why or why not? They did that analysis. They responded to comments from Sierra Club during the permitting process, looked at it, took a hard look, and decided that it was something that wasn't feasible under the circumstances. And that's how you do your backed analysis. This is not a situation where they just ignored things, didn't consider them, didn't respond to them during the process. And I see I am just about out of time, so if the Court has anything else. All right. Thank you. Thank you. Ms. Smith. Thank you, Judge Stewart. May it please the Court, Kelsey Smith on behalf of the Louisiana Department of Environmental Quality. As Ms. Petronio just explained, if this Court reaches the merits, then this Court should affirm the issuance of the permit. But for the reasons explained in our brief, we do not think this Court can reach the merits because it does not have jurisdiction. Section 717RD1 of the Natural Gas Act does not give this Court exclusive jurisdiction for two reasons. First, LDEQ did not issue the permits pursuant to federal law. It did so pursuant to state law, its own state implementation plan. But isn't Louisiana required to create a SIP and get it approved by EPA under federal law? Louisiana is not required to create a SIP, but it is required to have it approved under federal law by the EPA, yes. But that doesn't mean that it is not acting pursuant to a state implementation plan and state laws. The EPA did approve Louisiana's SIP and Title V program before they became effective for the purposes of the Clean Air Act. What's your best case under this factual scenario that we face today that the Court doesn't have jurisdiction? It seems like the other circuits, there was some other circuit authority that rejected that argument. Yes, there are other circuits that reject that argument, specifically the First and the Fourth Circuit. There is not a case directly on point that says that acting pursuant to a state implementation plan is not pursuant to federal law. You want us to be it? Yes, I want you to be it. And the reasoning is that pursuant to doesn't have a special meaning here. And states do not act pursuant to federal law when they're implementing or enforcing their SIPs. And I think looking at other contexts involving federal law that is enforced by state agencies exemplifies this point. So as I said, states are not required to have SIPs. And some states don't. And some states don't have complete SIPs. And in those instances, the EPA itself steps in with a federal implementation plan. And that is enforced by the states. And so take, for example, states that don't have an approved SIP for significant deterioration of air quality permits or PSD permits. That includes states like Connecticut, Maryland, Massachusetts, New Jersey, and Washington. And in that situation, the EPA itself incorporates a SIP into the federal register copy of the state implementation plan. And then those states issue permits as if they were in the shoes of the EPA. And so those state agencies are acting pursuant to the federal law, which would be the federal implementation plan, to issue permits required by the EPA and the Clean Air Act or federal law. This situation is different because the LDEQ is acting pursuant to its state implementation plan to issue permits required by its state law or Section 302055. And this makes sense in the scheme of cooperative federalism because if acting under a state SIP is pursuant to federal law, then it will always be pursuant to federal law and not just in the Natural Gas Act context. This would provide a federal ingredient for any lawsuit and enable any case involving a SIP to be in federal court. So the more logical conclusion is that a state agency enforcing its state implementation plan is enforcing state law. And this court would then not have jurisdiction under the Natural Gas Act to consider this case. But regardless of whether the permits were created an issue pursuant to state law, this court doesn't have jurisdiction because this case does not arise under federal law. As Judge Oldham recently explained in his concurring opinion in Shrimpers and Fishermen of RGV, Section 717RD1 vests this court with original and exclusive jurisdiction to hear any civil action challenging actions made pursuant to federal law. But it does not create any civil action. It does not vest a person or class of persons with a right of review. It does not specify who can be sued as a defendant. And it does not specify a standard of review. It merely says that if you have a civil action, then this court has exclusive jurisdiction over it. And here, Sierra Club's cause of action is a state law. And more importantly, it is not one of those cases that fits into the slim, special, and small category of cases that originate under state law but still trigger federal question jurisdiction. Such cases require a federal issue be necessarily raised, actually disputed, substantial, and capable of resolution in a federal court without disrupting the state and federal balance approved by Congress. And here we obviously maintain that there is no federal issue raised because we are acting pursuant to state law. But even if you were to assume that 717RD1 gives this court statutory jurisdiction over a purely state law dispute, the mere fact that a suit is an adverse suit authorized by the statutes of Congress is not in and of itself sufficient to vest jurisdiction in the federal court. And for that proposition, Shoshone Mining Company v. Rutter is my best case. In that case, Justice Brewer examined a statute in which Congress authorized adverse mining suits to determine the mining rights between competing claimants. And there, the statute declared that the proceedings should commence in a court of competent jurisdiction. And much like the Clean Air Act, Congress instructed the courts to make its decisions based on local mining customs. And so the court concluded that a case arising under this federal law required nothing more than the interpretation and application of local rules and customs or state statutes. And therefore, it was not sufficient to vest jurisdiction in the federal court. The same holds true in our case. And this court should not simply assume that Congress gave it jurisdiction to consider a purely state law dispute between two in-state parties. This court also lacks jurisdiction to consider the public trust duty challenge. If 717RD1 grants jurisdiction, it only extends to permitting decisions taken by a state agency acting pursuant to federal law. But Louisiana's public trust duty is a state constitutional command. And this court only has jurisdiction to consider whether LDEQ's permitting decisions are consistent with its SIP and its Title V program, and not whether it is consistent generally with state law or its state constitutional command. Counsel, let me ask you whether putting aside the jurisdictional question, which you've covered in some detail, Louisiana's SIP includes the public trust doctrine, doesn't it? We do not believe that it includes the public trust doctrine, no. Okay, but the SIP specifically references revised Statute 30.2001. And if I'm not mistaken, those sections include the public trust doctrine, don't they? So the argument would be that 30.2018B, which requires a permanent applicant to submit the environmental assessment statement, somehow thus incorporates the public trust duty into the SIP. But requiring an environmental assessment statement, which is all 30.2018B does, does not incorporate this other state law constitutional command into the statute by reference. It makes sense, too, because the environmental assessment statement is what is used to complete the public trustee duty analysis, but it is not itself required by the SIP, no. But even if it were required by the SIP, LDEQ fulfilled its duty in performing the public trust duty analysis. It expressly considered the public trust duties before issuing the permits, and before it made its analysis using the actual balance in costs and benefits that was struck. And it was neither arbitrary nor did it give insufficient weight to environmental protection. For those reasons, we think there is no jurisdiction, and alternatively, the court should affirm. Thank you. All right, thank you. You got a lot in, and you're in for a minute. All right, Mr. Smith, take a minute to address the jurisdictional issue. I know you've got only five minutes, but at least take a minute. Okay. Thank you, Your Honor. Do you have a position? We do. Thank you, Your Honor. As you, I believe, recognized, every other circuit that's addressed the issue, including the first, third, fourth, and D.C. circuits, has found jurisdiction in similar situations where a state issues a Clean Air or Clean Water Act permit. Under the Natural Gas Act, this particular permit is required by federal law, required by the Clean Air Act, and was issued pursuant to federal law. In fact, throughout the justification for the permit, the agency repeatedly relies on EPA guidance. That's the entirety of the justification for using the SILs to say that it's not pursuant to that federal law. It's a little bit of a disconnect. In addition to that. She argued that relying on the federal guidance is synonymous with, quote, arising under federal law that she strongly argued. Not necessarily. I'm pointing out the disconnect there. But this permit was indisputably issued pursuant to the Clean Air Act, and in addition, as the Delaware River Court, the third circuit recognized in Delaware River, there is another basis to find that these permits are issued pursuant to federal law, and jurisdiction applies here, and that is the Natural Gas Act specifically preempts state regulation of LNG terminals, with the narrow exception of Clean Water Act, Clean Air Act, and Coastal Zone Management Act permits. And so unless the permit itself is issued pursuant to federal law, and it is, DEQ doesn't have any authority to issue the permit at all under the Natural Gas Act. So as the Delaware River Court explained, it is made pursuant to both the Natural Gas Act and the Clean Air Act itself. I do want to touch briefly on the public trustee piece, because even if the court were to find the public trustee obligation not incorporated into the SIP, the public trustee obligation is intertwined with any permitting decision. Louisiana courts have found that a permit decision made in the absence of public trustee consideration is, quote, null and void. I do want to also come back to the significance issues that Commonwealth raised, and in particular I want to borrow from the metaphor that my colleague raised, the spigot. And this is a good metaphor, because if we think of the NAX as a bucket that cannot be filled, cannot be overfilled, or else you will violate the law, looking at how much water is coming out of the spigot alone tells you nothing about whether the bucket is overflowing. And that's the fundamental problem here. DEQ has no information about the bucket in the area with respect to particulate matter, sulfur dioxide, and carbon monoxide. So as the DC Circuit recognized in the Sierra Club case, the area could be very close to exceeding the sill, and the agency could effectively permit unlimited, if you're just looking at the spigot alone, could effectively permit unlimited sources. Although they might each be below the sill, they could collectively cause a problem in exceeding the NAX. I also want to touch briefly on the concept that significance is somehow incorporated into 475 simply by virtue of Part C's title. Now it is true that the caption, the title of this subpart of the Clean Air Act, is the prevention of significant deterioration. That title covers nine different subparts, each of which consists of measures and regulatory provisions that apply to individual sources to protect against significant deterioration. And here the DC Circuit's opinion in the Blue Water case, which we cite in the brief, is instructive. That involved a different Clean Air Act program, but the reasoning is instructive here because unless individual sources under 7475 are regulated for contribution, it is almost impossible to ensure that the purposes of the prevention of significant deterioration program writ large are achieved. In my last moment or two, I do want to point out the deference issue and the conflict in EPA's interpretation. I encourage you to go look at the legal memorandum underlying the SILS guidance at 91 page 6, which makes clear that the SILS guidance does not actually apply to the step one analysis, the spigot analogy that we're talking about, and that is inconsistent with the guidance memo itself. And then with respect... Give him a minute additional because I had to address jurisdiction so you can finish this thought and then you're done. Thank you, Your Honor. And with respect to deference, EPA did try to codify the SILS, and the D.C. Circuit struck that down in part because it was unlawful. And it's notable that neither DEQ nor EPA have gotten around to codifying the guidance. And in fact, at AR 71 page 37, DEQ acknowledges that its working on guidance hasn't gotten around to it. And so deference to the agencies, each of these agencies, inconsistent and moving guidance that has not been reduced to regulation is not appropriate under these circumstances. I'll touch one last point on the BACT analysis, if I may. I'd encourage you again to go look at AR 71 83 and page 100, which contain the agency's rationale on BACT. With respect to catalytic oxidization, it's a one-paragraph explanation. It actually shows that it could be made effective, quote, effective, far from showing that it is technically infeasible. And with respect to the combustion turbines, the explanation is similarly lacking. The agency finds that a lower emission rate could be achieved and provides no rational basis for concluding that it cannot be. Thank you, Your Honor. I see that I'm up. Okay. Thank you, Mr. Smith. Thank you, Mr. Counsel. We will decide the figures argument in briefing.